RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

JAMES L. HALE,

> *Plaintiff-Appellee,*

*v.*

BILL JOHNSON, President and CEO of the Tennessee
Valley Authority,

> *Defendant-Appellant.*

No. 16-5475

—————————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:15-cv-00014—Harry S. Mattice, Jr., District Judge.

Argued: December 6, 2016

Decided and Filed: December 29, 2016

Before: BOGGS, GILMAN, and DONALD, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Tricia L. Roelofs, TENNESSEE VALLEY AUTHORITY, Detroit, Michigan, for
Appellant. Douglas S. Hamill, BURNETTE, DOBSON & PINCHAK, Chattanooga, Tennessee,
for Appellee. **ON BRIEF:** Tricia L. Roelofs, Edwin W. Small, TENNESSEE VALLEY
AUTHORITY, Detroit, Michigan, for Appellant. Douglas S. Hamill, BURNETTE, DOBSON
& PINCHAK, Chattanooga, Tennessee, for Appellee.

—————————————

## OPINION

—————————————

BERNICE BOUIE DONALD, Circuit Judge. After the Tennessee Valley Authority
("TVA") discharged James Hale for failing a pulmonary function test ("PFT")—a requirement
imposed by the TVA for employees to maintain their necessary medical clearance—Hale

brought claims for disability discrimination and failure to accommodate under the Americans with Disabilities Act and the Rehabilitation Act. The TVA moved for summary judgment, arguing that the court lacked subject-matter jurisdiction to hear the merits of Hale's claim under Title VII's national-security exemption and the *Egan* doctrine. The district court disagreed, but certified the case for interlocutory appeal. For the following reasons, we DENY the TVA's interlocutory appeal.

**I.**

All plant officers working for the TVA are required to maintain medical clearance as a condition of employment. Since his employment began in 2009, Hale had always maintained the level of clearance necessary for his position. However, in 2013, the TVA made a PFT a requirement to obtain this clearance; Hale failed the testing because of his chronic obstructive pulmonary disorder. The TVA terminated him as a result.

Hale then brought claims for disability discrimination and failure to accommodate under the Americans with Disabilities Act and the Rehabilitation Act. The TVA moved to dismiss for lack of subject-matter jurisdiction, arguing that: (1) Title VII's national-security exemption applies to the Rehabilitation Act and precludes the court from reviewing the physical-fitness requirements imposed by the Nuclear Regulatory Commission ("NRC") in the interests of national security; and (2) the *Egan* doctrine precludes the judiciary from reviewing the TVA's determination that Hale lacked the physical capacity to fulfill his job duties because this decision was one of national security.

The district court rejected both of the TVA's arguments. First, it noted that neither the Rehabilitation Act nor any provisions of Title VII that it references mentions the national-security exemption, and so concluded that the exemption was inapplicable to the Rehabilitation Act. Turning to the second argument, the district court reasoned that nothing in the language of the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), indicated an intent for its holding to apply outside of the context of security clearances. However, noting the importance of the issues involved on appeal and the lack of Sixth Circuit precedent on the issues, the court certified the case for interlocutory appeal under 28 U.S.C. § 1292(b).

**II.**

Title VII of the Civil Rights Act was amended in 1972 to provide federal employees a private right of action against their employers for employment discrimination. *Chandler v. Roudebush*, 425 U.S. 840, 841 (1976). However, under Title VII's national-security exemption, it is not unlawful for an employer to discharge an employee from his or her position if:

> (1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and
>
> (2) such individual has not fulfilled or has ceased to fulfill that requirement.

42 U.S.C. § 2000e-2(g).

The Rehabilitation Act prohibits federal agencies from discriminating against their employees on the basis of disability. *Smith v. U.S. Postal Serv.*, 742 F.2d 257, 258–59 (6th Cir. 1984). It makes available to plaintiffs "[t]he remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k)) (and the application of section 706(e)(3) (42 U.S.C. 2000e-5(e)(3)) to claims of discrimination in compensation)." 29 U.S.C. § 794a(a)(1). Though this provision specifically references Section 717 of Title VII, neither § 794a nor the subsections it cross-references mention Title VII's national-security exemption. So, our task is to ascertain whether, under recognized principles of statutory construction, the national-security exemption applies to § 794a, notwithstanding the absence of an explicit reference to the exemption.

**A.**

The TVA reasons that the national-security exemption applies to all employment-discrimination claims because Section 717 borrows Title VII's federal-employee provisions, which in turn incorporate the national-security exemption. So, it asserts that we must determine what remedies, procedures, and rights Section 717 encompasses. That section, the TVA asserts,

has historically incorporated rights and remedies not specifically cross-referenced therein; therefore, the national-security exemption applies generally to the Rehabilitation Act.

Our inquiry begins with the language of the statute. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *accord Barnhart*, 534 U.S. at 450. This plain meaning is conclusive, except in the "rare cases" when such a meaning "will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Nonetheless, we must take care not to interpret the language in a vacuum; instead, we must look to the "structure, history, and purpose" of the statutory scheme. *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)). Importantly, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart*, 534 U.S. at 452 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). In the broader context, when "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," we must take care not to read one part of the scheme "to provide a different, and conflicting, solution to a problem that has already been specifically addressed elsewhere" in the scheme. *Negusie v. Holder*, 555 U.S. 511, 545 (2009) (Thomas, J., dissenting) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996)).

First, looking to the plain, unambiguous language of the statute, as noted, neither § 794a(a)(1) nor the subsections it cross-references contain an express reference to the national-security exemption. Though the TVA would have us hold that *all* of Title VII applies to the Rehabilitation Act, that conclusion does not naturally follow from the language of § 794a, which expressly limits the "remedies, procedures, and rights" available to those set forth in specifically listed sections of Title VII. If Congress intended for all of Title VII's provisions to apply, surely it would not have enumerated specific sections. Indeed, in the adjacent provision, § 794a(a)(2),

Congress managed to express its intent to make all of Title *VI* applicable to that subsection by broadly delineating the availability of "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.)." 29 U.S.C. § 794a(a)(2). We presume that by declining to include a reference to Title VII in its entirety in the preceding subsection, it intended for only the specified sections of Title VII to apply. *See Barnhart*, 534 U.S. at 452. Thus, absent indications that excluding the national-security exemption from the Rehabilitation Act is "demonstrably at odds" with the drafters' intentions, we will not stray from this interpretation. *See Ron Pair*, 489 U.S. at 242 (citation omitted).

Turning to the history of these provisions, we have not found, nor has the TVA cited, anything in the legislative history of the Rehabilitation Act or Section 717 that firmly establishes the applicability of the exemption. The TVA points us to the legislative history of Section 717, an excerpt of which reads: "In providing the statutory basis for such appeal or court access, it is not the intent of the Committee to subordinate any discretionary authority or final judgment now reposed in agency heads by, or under, statute for national security reasons in the interests of the United States." S. Rep. No. 92-681, at 21 (1972) (Conf. Rep.), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2185. But the TVA's reliance on this passage merely begs the question as to whether the national-security exemption is applicable in this context: it assumes that the agency heads have authority under the national-security exemption, but the TVA has not established that any authority granted under that exemption applies to Section 717 of the Rehabilitation Act.

The inapplicability of the national-security exemption to the Rehabilitation Act is reinforced by the seeming absence of case law applying the exemption to claims brought under the Rehabilitation Act. The TVA has not cited, nor have we found, a single such case.[1] Nonetheless, the TVA insists that it is Section 717 that incorporates the exemption. However, it cites only one case directly applying the national-security exemption to a claim brought under that section. In *Molerio v. F.B.I.*, the plaintiff brought a Title VII claim under Section 717, alleging that the Federal Bureau of Investigation's policy of denying top-secret security clearance to those with relatives residing in countries with interests hostile to those of the United

---

[1]One case, *Guillot v. Garrett*, references the exemption in the context of a Rehabilitation Act claim, but the Fourth Circuit decided that case under the *Egan* doctrine. 970 F.2d 1320, 1324–26 (4th Cir. 1992). So its reference to the applicability of the exemption is dicta and, given the lack of analysis on the issue, it is unpersuasive dicta.

*Hale v. Johnson*

States had a disparate impact on applicants like him of Cuban ancestry.  749 F.2d 815, 819, 822–23 (D.C. Cir. 1984).  The court disagreed, reasoning that the policy would have no more impact on Cubans than on individuals from places like East Germany or Iran.  *Id.* at 823.  It went on to recognize that national-security clearance requirements are generally valid under the national-security exemption and held that such requirements were not by themselves evidence of discrimination.  *Id.*  However, it did not analyze the applicability of the exemption to Section 717.  Moreover, the court did not hold that the exemption precluded it from judicial review of the plaintiff's claim.  Therefore, this case does not convince us to rule in the TVA's favor.

We find equally unpersuasive the remaining authority cited in the TVA's brief.  For instance, it cites *Chandler v. Roudebush* for the proposition that Section 717 grants federal employees "the full rights available in the courts as are granted to individuals in the private sector under title VII."  425 U.S. at 841.  Although the Court uses this broad language, it does so in the context of deciding that, after the 1972 amendments, federal employees have the same right as private employees to a *de novo* trial of their employment-discrimination claims.  *Id.* That federal employees are entitled to this right under Section 717 was plainly evidenced from that section's *express reference* to Section 706, which historically gave private-sector employees the right to *de novo* review of their claims.  *Id.* at 844–45.  To confirm the plain reading of the statute, the court looked to the legislative history, which "unmistakably" indicated that it was Congress's intent to provide both private and federal employees the right to trials in district courts.  *Id.* at 848–61.  Here, we are neither faced with an express reference to a section that applies the national-security exemption, nor unmistakable indications of congressional intent that the exemption applies to Hale's claims.

The TVA also points us to *Smith v. United States Postal Service*.  But though the court in *Smith* applied a procedure not specifically referenced in the Rehabilitation Act, again, it involved a much clearer indication of congressional intent to include those rights and procedures than we have here.  742 F.2d at 260–62 (applying an exhaustion requirement not specifically referenced in the Rehabilitation Act based on "longstanding congressional policy favoring resolution of claims of employment discrimination through administrative conciliation").

When faced with language that references only specific sections of Title VII and less-than-illuminating case law and legislative history, the TVA's position cannot prevail. *See Chandler*, 425 U.S. at 848 ("[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." (quoting *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925)). Therefore, we hold that the national-security exemption does not apply to Hale's Rehabilitation Act claim.

## III.

*Egan* and its progeny preclude judicial review of security-clearance decisions. The TVA insists that *Egan*'s underlying logic indicates that it should not be narrowly construed, as emphasized by two circuit decisions that extend its reasoning outside of the scope of security clearances. *See Foote v. Moniz*, 751 F.3d 656 (D.C. Cir. 2014); *Kaplan v. Conyers*, 733 F.3d 1148 (Fed. Cir. 2013). Consequently, it reasons that "[a] predictive judgment about whether an individual has the requisite level of physical capacity to effectively protect a nuclear plant from attack involves precisely the same type of 'predictive judgment' based on national security concerns that the *Egan* Court determined was unreviewable." Appellant Br. at 28 (quoting *Egan*, 484 U.S. at 529).

The TVA's argument for the extension of *Egan* in this context is unavailing. There, Egan, who worked for the Navy, was fired after the Director of the Naval Civilian Personnel Command denied a security clearance necessary for Egan's position based on his criminal record and history of drinking problems. 484 U.S. at 520–22. The case required the Court to resolve the "narrow question" of whether the Merit Systems Protection Board, which declined to review the propriety of the Navy's denial of Egan's security clearance, "has authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action." *Id.* at 520, 524. Emphasizing executive agencies' role to protect information bearing on national security and the President's authority to control access to such information, the Court concluded that the "sensitive and inherently discretionary judgment call" required to make predictive judgments about an individual's likelihood of

compromising sensitive information is best left to those with an expertise in rendering judgments based on this "inexact science." *Id.* at 524–30.

Though we have logically applied the rule announced in *Egan* to preclude judicial review of security-clearance decisions, *see Tenenbaum v. Caldera*, 45 F. App'x 416, 417–18 (6th Cir. 2002) (collecting cases), nothing in the language of the Court's opinion suggests that even if its reasoning could extend beyond security clearances, it could reach the scope the TVA desires. For one, the Court explicitly narrowed its holding to address the review of decisions to revoke or deny security clearances, *Egan*, 484 U.S. at 520, which are not at issue in this case. It then proceeded to analyze the importance of executive control over access to national-security *information*, *id.* at 526–30, not general national-security concerns such as those applicable in determining whether an individual has the physical capacity to guard a nuclear plant. Even more importantly, due to the highly discretionary and imprecise nature of making judgments regarding a person's propensity to disclose classified information, the Court concluded that "[c]ertainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529.

In contrast to this type of predictive judgment, the determination of an individual's physical capability to perform a job is based on hard science and has historically been reviewed by courts and administrative agencies. We need not create a *per se* rule that *Egan* can never apply outside of the context of security clearances. But put simply, nothing in *Egan* suggests that its holding applies to physical-fitness judgments, even if purportedly based on the interest of national security. *See Toy v. Holder*, 714 F.3d 881, 885 (5th Cir. 2013) ("No court has extended *Egan* beyond security clearances, and we decline to do so."); *Rattigan v. Holder*, 689 F.3d 764, 768 (D.C. Cir. 2012) ("[W]e adhere to our holding that *Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel . . . .").

The cases relied on by the TVA in support of extending *Egan* do not demand a contrary result. In *Kaplan*, the court extended *Egan* to prohibit review of the Department of Defense's "determinations concerning eligibility of an employee to occupy a 'sensitive' position,

*regardless of whether the position requires access to classified information.*" *Kaplan*, 733 F.3d at 1151 (emphasis added). The court reasoned that "sensitive positions" affecting national security and access to classified information are "parallel concepts" and that there is "no meaningful difference in substance between" the two. *Id.* at 1159–60. We decline to pass judgment on whether *Egan*'s scope includes more than just security clearances because, even if *Kaplan* properly extended *Egan*, the eligibility to occupy a "sensitive" position more closely resembles the type of predictive judgment in *Egan* than does a judgment concerning physical fitness. *Kaplan* emphasized that similar types of expertise are necessary in making employment decisions about those who may occupy "sensitive positions" and those who have access to classified information. *Id.* at 1156, 1164. But, as previously noted, the judiciary plainly does not lack the kind of expertise in judgments concerning an individual's physical fitness that would preclude review of such determinations.

Likewise, in *Foote*, the court extended *Egan* to preclude review of the Department of Energy's decision not to certify an applicant based on the Human Reliability Program, specifically the program's psychological examination. *Foote*, 751 F.3d at 657–58. Yet again, this highly subjective program is distinct from the physical examination in this case. In *Foote*, the Human Reliability Program was designed to weed out "unreliable or unstable individuals," which, like in *Egan*, involved an attempt to predict an individual's propensity to compromise sensitive information. *See id.* at 658–59. Such an attempt is not involved in a physical-fitness examination.

Therefore, we will not extend *Egan* to preclude judicial review of an agency's determination regarding an employee's physical capability to perform the duties of his or her position. Remaining faithful to *Egan* and the logic on which it stands prevents this circuit from slipping into an untenable position wherein we are precluded from reviewing any federal agency's employment decision so long as it is made in the name of national security.

**IV.**

For the aforementioned reasons, we **DENY** the TVA's interlocutory appeal.