**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 11, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————

SIGIEFREDO SANCHEZ,

     Plaintiff - Appellant,

v.

No. 16-2056

UNITED STATES DEPARTMENT OF
ENERGY; DR. ERNEST MONIZ, United
States Secretary of Energy, in his official
capacity,

     Defendants - Appellees.

———————————————

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:13-CV-00656-KG-LF)**
———————————————

Deborah R. Stambaugh (Mark C. Dow, with her on the briefs), Bauman, Dow &
Stambaugh, PC, Albuquerque, New Mexico, for Plaintiff-Appellant.

Joseph F. Busa, Attorney (Charles W. Scarborough, Attorney, Benjamin C. Mizer,
Principal Deputy Assistant Attorney General, and Damon P. Martinez, United States
Attorney, with him on the brief), Office of the United States Department of Justice,
Washington, D.C., for Defendants-Appellees.

———————————————

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
———————————————

**PHILLIPS**, Circuit Judge.
———————————————

While he was reading a daily report aloud to his colleagues, Sigiefredo Sanchez mixed up the order of words and numbers, skipped over sections, and gave briefing points out of order. These were signs of a reading disorder that Sanchez was unaware he had. Because his job required him to provide transportation information to nuclear convoys, his reading disorder presented a potential threat to national safety. Once his condition was diagnosed, Sanchez lost his safety-and-security clearance. Then, after unsuccessfully requesting accommodations, Sanchez was fired.

Sanchez sued his former employer for due-process and Rehabilitation Act violations. The district court granted judgment on the pleadings and dismissed Sanchez's claims. It relied in part on the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988). *Egan* and later cases relying on it prohibit courts and agencies from reviewing the merits or motives of the Executive Branch's security-clearance decisions. This bar on judicial and administrative review stems from the principle that security-clearance decisions involve sensitive and classified information of the sort best left to the Executive Branch's purview.

But *Egan* barred only judicial or administrative "review." 484 U.S. at 529. So *Egan* would not reach a case with an unchallenged security-clearance decision, requiring no judicial or administrative review. We find ourselves in that situation today and must decide whether *Egan* bars our review of Sanchez's claims. We AFFIRM in part and REVERSE in part.

**BACKGROUND**

**I.     HRP Certification**

On August 20, 2006, Sanchez became an Emergency Operations Specialist for the National Nuclear Security Administration (the "Administration"). The Administration is an agency within the Department of Energy that ensures the security of nuclear weapons and materials and "safeguard[s] the safety and health of the public." 50 U.S.C. § 2401(c). Sanchez worked within the Administration's Office of Secure Transportation, which oversees the transportation of nuclear weapons and materials (we refer to this office, the Department of Energy, and the Administration as the "Department"). Before taking this position, Sanchez already had over thirteen years of federal employment and was less than three years away from being eligible to receive federal-retirement benefits.

Sanchez's job as an Emergency Operations Specialist required him to answer 911 calls and relay GPS locations, mile markers, and other directions to and from nuclear-convoy commanders. Because these duties could affect public safety, Sanchez's position also required a Human Reliability Program ("HRP") certification.

The HRP derives from federal regulations governing safety and security within the Department. 10 C.F.R. § 712.1. It ensures that people working with nuclear materials "meet the highest standards of reliability and physical and mental suitability" and uses "a system of continuous evaluation" to "identif[y] individuals whose judgment and reliability may be impaired by physical or mental/personality disorders," among other impairments. *Id.* Department officials—including specially

3

trained managers, HRP-certifying officials, and HRP-designated psychologists and physicians—oversee the HRP-certification and decertification process. *See generally id.* § 712.3 (defining roles). When concerns arise, these Department officials apply HRP guidelines in notifying the employee and recommending a course of action. *See id.* § 712.19.

Sanchez became HRP certified and worked for a little over five months without issue.

## II.     HRP Revocation and Job Suspension

This changed when Sanchez made multiple mistakes while reading a daily report aloud to his colleagues. During the briefing, Sanchez confused the origin and destination cities of mission convoys and mixed up letters and numbers within mission-identification codes. For example, he read trip number Q12-345 as "345-Q12." Appellant App. vol. II at 363. Yet, unaware that he had made mistakes, Sanchez thought the briefing "went well." *Id.* at 364.

After this briefing, two of Sanchez's supervisors followed up with him to assess his reading abilities. They had him read a shift brief to them; and again, Sanchez skipped over items and read numbers incorrectly. Sanchez's direct supervisor, John Vukosovich, grew concerned about Sanchez's ability to transpose mile markers, GPS locations, and other critical information needed in emergencies, so he and Sanchez's other supervisor sent him for a medical evaluation with the Department's HRP psychologists.

The Department's psychologists evaluated Sanchez and interviewed his

4

supervisors, including Vukosovich, who described Sanchez as "slow in learning his job tasks," and explained how "reading problems could significantly interfere with Mr. Sanchez's duties." Appellant App. vol. I at 19. After evaluating Sanchez, the Department's psychologists concluded that Sanchez had Mixed Receptive-Expressive Language Disorder. Based on this conclusion, the Department's lead psychologist, Dr. Anthony Traweek, recommended to the Department:

> (1) Do not recertify [Mr. Sanchez] under HRP . . . [;]
>
> (2) Facilitate Mr. Sanchez's pursuit of appropriate Federal employment in which there is the possibility for reasonable accommodation of his apparent Mixed Receptive-Expressive Language Disorder[; and]
>
> (3) Provide Mr. Sanchez with the opportunity to personally discuss the findings and recommendations of the special evaluations process . . . .

*Id.* at 40 (emphasis omitted).

While the psychological evaluations were ongoing, the Department removed Sanchez from his HRP duties and restricted him to doing research assignments and filing weather-condition reports. It also prohibited Sanchez from answering 911 calls, logging into classified computers, handling trip folders, and relaying information to convoy commanders. And, when his coworkers sat for their morning-shift briefings, the Department had Sanchez work in a different room.

On August 25, 2008, after receiving Dr. Traweek's recommendation, the Department notified Sanchez that it had revoked his HRP certification. In doing so, it relied on 10 C.F.R. § 712.13(c)(1), which speaks to the impact of an employee's "[p]sychological or physical disorders that impair performance of assigned duties."

5

10 C.F.R. § 712.13(c)(1).

Because Sanchez had never been diagnosed with Mixed Receptive-Expressive Language Disorder, he doubted the Department's evaluations. He hired his own psychologist, Dr. John King, who concluded that Sanchez had a reading disorder and agreed that Sanchez should not perform "duties associated with an emergency operations specialist." Appellant App. vol. II at 361. Dr. King also noted that when given extra time on reading tests, Sanchez's reading performance and comprehension improved to a low-average range.

On September 12, 2008, the Department notified Sanchez that it was proposing to suspend him indefinitely and that Vukosovich was the deciding official. After considering a number of factors (called the "Douglas Factors"), which included Sanchez's inability to perform his duties without HRP certification and with "[n]o other alternatives available," Vukosovich indefinitely suspended Sanchez. Appellant App. vol. I at 169.

## III.    Accommodation Requests

Sanchez and others on his behalf made at least a dozen accommodation requests. Specifically, they requested that the Department reassign Sanchez to a position that didn't require an HRP certification (we refer to these jobs as "non-HRP jobs").

When Sanchez's Equal-Employment-Opportunity Counselor asked the Department's Human Resources Manager, Melissa Maestas, if the Department would reassign Sanchez to a non-HRP job, Maestas responded that she was under no

6

obligation to reassign Sanchez, but encouraged Sanchez to look for vacancies. She also said that she would try to find Sanchez a temporary reassignment. When Sanchez later asked Maestas a second time for a reassignment, Maestas responded that "no reassignment action [was] in place or planned." Appellant App. vol. III at 458.

Eventually the Department instructed Sanchez to direct his reassignment requests to Vukosovich. But Sanchez felt that Vukosovich was biased because he had given him a negative performance review and had once publicly reprimanded and threatened to terminate him. So instead, Sanchez asked the Department to appoint an impartial decision-maker. Vukosovich handled this request too, and responded that his potential bias "was a separate issue and ha[d] no bearing on the matter." Appellant App. vol. I. at 23. And, addressing Sanchez's reassignment request, Vukosovich informed Sanchez that the "Operations Division does not have work available to which you may be assigned pending the final resolution of your HRP certification." *Id.* at 24. Though other divisions within the Department had vacancies for non-HRP jobs, including a Business and Acquisition Specialist position as well as 28 other positions, Vukosovich never told Sanchez about them.

Later, at a certification-review hearing, Sanchez again requested an accommodation through reassignment. During the hearing, Sanchez didn't challenge the Department's temporary HRP-decertification or its recommendation that he not perform HRP jobs. In fact, he presented his expert, Dr. King, who agreed that Sanchez could not perform HRP duties. On September 17, 2009, the Department

7

issued its final decision decertifying Sanchez from the HRP. Soon after this, on December 6, 2009, in a notice written by Vukosovich, the Department fired Sanchez.

Despite offering to take "any position, even janitorial," the Department never reassigned Sanchez. *Id.* at 25. Instead, it fired him two years before he could retire.

## IV.    **Sanchez Sues the Department**

After exhausting his administrative remedies, Sanchez sued both the Secretary of Energy, in his official capacity, and the Department (we continue using the "Department" to refer to both defendants). Under the Rehabilitation Act, Sanchez alleged claims for: (1) failure to accommodate ("Claim 1"); (2) disparate-treatment discrimination ("Claim 2"); and (3) retaliation ("Claim 3"). He also alleged a fourth claim for violation of procedural due process ("Claim 4"), claiming that Vukosovich was not an impartial decision-maker.

The Department moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) (the "Rule 12(c) Motion"). It argued that the Supreme Court's decision in *Egan* precluded the district court from reviewing its HRP-revocation decision, and thus moved to dismiss the claims for lack of jurisdiction. Sanchez responded to the Department's motion, disputing *Egan*'s application to his claims.

Meanwhile, with the Rule 12(c) Motion pending, the district court allowed the parties to engage in discovery. During discovery, Dr. Traweek testified about how the HRP distinguishes between safety and security concerns and agreed that the Department had revoked Sanchez's HRP certification for safety rather than security reasons.

8

Wanting to use this testimony to argue against *Egan*'s bar and help show that the HRP regulations entitled him to reassignment, Sanchez filed a Motion to Supplement Plaintiff's Response to [Department's] Motion for Judgment on the Pleadings (the "Motion to Supplement"). Both parties also moved for partial or full summary judgment.

But the district court didn't consider the parties' cross summary-judgment motions and denied Sanchez's Motion to Supplement. A year and a half after the Department filed its Rule 12(c) Motion, the district court granted the Rule 12(c) Motion, dismissing all of Sanchez's claims. The district court found that it lacked jurisdiction to review the merits of the Department's decision to revoke or deny a security clearance under *Egan*, and dismissed Claims 1-3 on this basis. It dismissed Claim 4 on the merits, finding that Sanchez failed to state a claim. Sanchez appeals.

## DISCUSSION

On appeal, Sanchez argues that the district court: (1) abused its discretion by denying Sanchez's Motion to Supplement; (2) failed to accept Sanchez's well-pleaded allegations and made findings of fact contrary to the complaint's allegations; (3) erred in holding that *Egan* prohibited the court from reviewing Claim 1, the failure-to-accommodate claim; (4) erred in holding that the Department isn't required to reassign disabled employees; and (5) improperly dismissed Claim 4, Sanchez's procedural-due-process claim.[1] We address Sanchez's five arguments on appeal in a

---

[1] Because Sanchez addresses only Claims 1 and 4, his failure-to-accommodate

different order and manner.

Because *Egan* presents a jurisdictional issue, we start there and review whether the district court had subject-matter jurisdiction over Claim 1 (the failure-to-accommodate claim) or Claim 4 (the procedural-due-process claim). *See Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1998) (questioning the district court's jurisdictional basis to examine a security-clearance decision). We conclude that *Egan* prohibits review of Claim 4, but not Claim 1. Thus, we affirm the district court's dismissal of Claim 4. This disposes of Sanchez's third and fifth arguments on appeal. Sanchez's first argument on appeal—that the district court abused its discretion by denying his Motion to Supplement—implicates our *Egan* analysis because Sanchez wanted to use his Motion to Supplement to show, in part, that *Egan* applied only to security-related decisions rather than safety-related decisions. So we also address Sanchez's first argument within our *Egan* analysis.

After our *Egan* analysis, we address whether Sanchez has stated a failure-to-accommodate claim under the Rehabilitation Act. We conclude that he did, and thus we reverse the district court's dismissal of Claim 1. This disposes of Sanchez's second and fourth arguments.

---

and due-process claims, he has waived our review of Claims 2 and 3, the disparate-treatment and retaliation claims. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (noting that issues inadequately raised in an appellant's opening brief are waived).

10

**I.      Does *Egan* Bar Review of Sanchez's Claims?**

*Egan* prohibits "any external review (including judicial review) of security clearance decisions." *Duane v. U.S. Dep't of Defense*, 275 F.3d 988, 993 (10th Cir. 2002). This means district courts lack jurisdiction to review the merits or motives of a decision to revoke or deny a security clearance. *See Hill*, 844 F.2d at 1411. Because *Egan* presents a subject-matter jurisdiction hurdle, our review is de novo. *See Barnes v. Harris*, 783 F.3d 1185, 1189 (10th Cir. 2015).

*Egan* applies when an agency has made (1) a security-clearance decision that (2) a plaintiff attempts to challenge. So a two-part framework guides us. To analyze whether *Egan* bars our review of Sanchez's claims, we break our discussion into two inquiries: first, was the HRP-revocation decision even a security-clearance decision?; and second, if so, do Sanchez's claims challenge the merits or motives of that decision?

On the first inquiry, we conclude that the Department's HRP-revocation decision was a security-clearance decision under *Egan*. On the second inquiry, we conclude that Sanchez's procedural-due-process claim challenges the merits or motives of that decision but that his failure-to-accommodate claim does not. Thus, *Egan* bars our review of Claim 4 but not Claim 1.

**A.      Was the HRP-Revocation Decision a Security-Clearance Decision?**

Though the Department asserts that "the precise legal question presented in this case" is whether the HRP-revocation decision was a security-clearance decision, Appellee Response Br. at 19, Sanchez seemed to concede that point, *see* Appellant

Opening Br. at 37 ("Here, Mr. Sanchez stipulated to removal of his HRP certification . . . ."). Within his Motion to Supplement, however, Sanchez tries to show that his HRP certification "was revoked not for a national security reason, but for a safety reason." Appellant Opening Br. at 12.

So to the extent Sanchez's appeal could be construed as arguing that the Department's HRP-revocation decision was not a security-clearance decision (and was instead a safety decision), we consider and dispose of it by comparing the security-clearance decision in *Egan* with the Department's HRP-revocation decision here. We conclude that the Department's HRP-revocation decision was a security-clearance decision.

### 1. *Egan*

In *Egan*, an employee attempted to challenge the Navy's security-clearance denial by appealing to the Merit Systems Protection Board (the "Board"). 484 U.S. at 520. The Board held that it lacked authority to review the denial, and the Supreme Court agreed. *Id.* at 523. The Court based its holding on separation-of-powers concerns, deference to national-security decisions, and the nature of security-clearance decisions as imprecise and difficult to review. *See id.* at 528-29, 531.

Because an agency derives its authority to grant or deny security clearances from the President's Article II Commander-in-Chief authority, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530. Also, security clearances implicate national-security interests, so outside bodies should not second-guess the decision to revoke or

12

deny a security clearance. *See id.* at 531. Finally, because security-clearance decisions involve predictions about someone's future conduct, the decision-makers must engage in "an inexact science at best." *Id.* at 529 (quoting *Adams v. Laird*, 420 F.2d 230, 239 (D.C. Cir. 1969)). So expecting an "outside nonexpert body to review the substance of such" decisions is unreasonable because they require "[p]redictive judgment[s] [that] . . . must be made by those with the necessary expertise in protecting classified information." *Id.*

We must decide whether these security-clearance characteristics from *Egan* extend to the HRP.

### 2.      The HRP & *Egan*

In *Foote v. Moniz*, 751 F.3d 656 (D.C. Cir. 2014), the court decided that the Department's HRP decisions qualify as security-clearance decisions under *Egan*. We find its reasoning persuasive.

In *Foote*, the Department refused to certify a job applicant under the HRP, and the applicant sued under Title VII, claiming race-based discrimination. *Id.* at 657. The court held that *Egan* insulated the Department's HRP decision. *Id.* at 657-59. It reasoned that *Egan*'s separation-of-powers concerns extended to the HRP. *Id.* at 658. As in *Egan*, where the Navy derived its power to make security decisions from the President's Article II Commander-in-Chief authority, the HRP "was established in part under the same Executive Order"; and applicants seeking HRP certification had to "possess or obtain a 'Q' access authorization, the [Department's] highest level of security clearance." *Id.* at 658-59.

13

In addition, similar to the security clearance in *Egan*, Sanchez's HRP certification indisputably involves national security because it authorized his involvement with nuclear materials, devices, and facilities. As *Foote* said, the HRP's national-security implications are so obvious that they "require[] no extended discussion." *Id.* at 658. And, like the decision-makers in *Egan*, HRP decision-makers must "attempt to predict" who could compromise sensitive information. *Id.* at 659 (quoting *Egan*, 484 U.S. at 528).

Based on the similarities between HRP certifications and the security-clearance in *Egan*, we will not invoke jurisdiction by crediting Sanchez's argument that his HRP certification "was revoked not for a national security reason, but for a safety reason." Appellant Opening Br. at 12. *Egan* insulates the Department's HRP decisions because the HRP stems from the Executive Branch's authority; it regulates who may be involved with nuclear materials, devices, and facilities; and the decision-makers involved must make predictive judgments.

Though Sanchez's reading disorder would not compromise classified information in the same way that a person's disloyalty to our country would, it still has the potential to expose the nation to risk. *See Kaplan v. Conyers*, 733 F.3d 1148, 1160 (Fed. Cir. 2013) (emphasizing that national security is what matters in an *Egan* analysis, and not that a position requires access to classified information). The Department must shoulder the delicate task of weighing these risks and safety margins while safeguarding the country's nuclear materials, devices, and facilities. *See Egan*, 484 U.S. at 529 (rejecting the idea that an outside body can "determine

14

what constitutes an acceptable margin of error in assessing the potential risk"). And that balancing act should remain immune from our review. *See Merida Delgado v. Gonzales*, 428 F.3d 916, 920 (10th Cir. 2005) (instructing that "[i]t is rarely appropriate for courts to intervene in matters closely related to national security").

### 3. Motion to Supplement

Sanchez argues that the district court erred in denying his Motion to Supplement. For our purposes here, we construe the Motion to Supplement as a motion to amend, so we review the district court's denial for an abuse of discretion. *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1249 (10th Cir. 2009).

Sanchez filed his Motion to Supplement to show (at least in part) that *Egan* extends to only security- and not safety-related HRP decisions.[2] We conclude that *Egan* extends to both safety- and security-related HRP decisions. Therefore, the safety-versus-security dichotomy given in Sanchez's Motion to Supplement is insufficient to establish jurisdiction. In this regard, the Motion to Supplement was futile and the district court acted within its discretion in denying it. *See Castleglen, Inc. v. Resolution Tr. Corp.*, 984 F.2d 1571, 1584-85 (10th Cir. 1993) (explaining that a district court acts within its discretion when it denies a futile motion to amend).

---

[2] Sanchez also argues that his Motion to Supplement proved that the HRP regulations entitled him to reassignment. Because we conclude in Part II.B. that Sanchez was entitled to reassignment under the Rehabilitation Act, we need not address whether the HRP regulations provided him with a separate right to reassignment.

15

**B.      Do Sanchez's Claims Challenge the Department's Merits or Motives?**

Although the Department's HRP-revocation decision was a security-clearance decision, our analysis must continue. If Sanchez's claims leave the HRP-revocation decision unchallenged, then the district court has jurisdiction to review them. *See Duane*, 275 F.3d at 993 (holding jurisdiction existed to review claims unrelated to the merits of the security-clearance decision); *Zeinali v. Raytheon Co.*, 636 F.3d 544, 550 (9th Cir. 2011) ("[F]ederal courts have jurisdiction to decide claims that 'do [] not necessarily require consideration of the merits of a security clearance decision,' as long as they remain vigilant not to 'question the motivation behind the decision to deny [the plaintiff's] security clearance.'" (second and third alterations in original) (quoting *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008))); *Stehney v. Perry*, 101 F.3d 925, 932 (3d Cir. 1996) (emphasizing that "not all claims arising from security clearance revocations violate" *Egan*).

Thus, we move to the second inquiry and examine Sanchez's claims in more detail. We start with Claim 1, Sanchez's failure-to-accommodate claim.

**1.      Failure to Accommodate & *Egan***

Sanchez alleged a Rehabilitation Act violation based on the Department's failure to engage in an interactive process and its failure to reassign him to a non-HRP job. The district court dismissed this claim because it concluded that it lacked jurisdiction under *Egan*. We disagree.

"The limited appeal of agency security clearance-based actions does not

16

remove federal employees from all other employment rights and benefits." *Adams v. Dep't of Defense*, 688 F.3d 1330, 1334 (Fed. Cir. 2012). One such right stems from the Rehabilitation Act, which requires federal employers to do more than treat disabled and nondisabled employees alike. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). Under the Rehabilitation Act, employers have to "meet the needs of disabled workers and . . . broaden their employment opportunities." *Id.* at 1337-38. In line with this goal, the Rehabilitation Act imposes a duty on federal employers to "provide reasonable accommodations to disabled employees." *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012). A reasonable accommodation might include "things like adding ramps or allowing more flexible working hours" or reassigning a disabled employee to a vacant position. *Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1162 (10th Cir. 2014); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999). If an employer fails to satisfy its duty to accommodate, a disabled employee or job applicant may bring a failure-to-accommodate claim under the Rehabilitation Act.[3]

To state a failure-to-accommodate claim, Sanchez must allege that he: (1) is disabled; (2) is "otherwise qualified"; and (3) requested a plausibly reasonable accommodation. *Sanchez*, 695 F.3d at 1177 (quoting 29 U.S.C. § 794(a)). Once he

---

[3] Though Sanchez brings his claim under the Rehabilitation Act, we rely on case law interpreting failure-to-accommodate claims brought under that act as well as under the Americans with Disabilities Act (the "ADA"). Case law interpreting either act applies to failure-to-accommodate claims. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

alleges these elements, "an employer generally may avoid liability only if it can prove the accommodation in question imposes an undue hardship on its business." *Hwang*, 753 F.3d at 1161.

Sanchez alleges these elements. Specifically, he contends that he is disabled and that the Department failed to accommodate him by not engaging in an interactive process and by not reassigning him to another position after he "repeatedly offered to take any job," including a janitorial position. Appellant App. vol. I at 273.

We can review Sanchez's claim precisely because he wanted a non-HRP job. These jobs didn't require an HRP clearance or potentially threaten national security—they were non-sensitive positions. So while the Department's "investigation, suspension, and recommended revocation of" Sanchez's HRP clearance are all shielded by *Egan*, *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 852 (10th Cir. 2007), the later decisions not to engage with him when he requested a non-HRP job or to reassign him to a non-sensitive, non-HRP job are not. In determining whether the Department failed to reassign Sanchez or interact with him, we would not need "to examine the legitimacy of the [Department's] proffered reasons and the merits of the revocation decision" or "the circumstances under which the [Department] recommended revocation."[4] *Id.* at 852-53; *see also*

---

[4] We acknowledge that not all failure-to-accommodate claims will follow Sanchez's limited scope, thus we narrow our conclusion to his allegations. *Egan* might still apply, for instance, to failure-to-accommodate claims when the employee has requested: (1) reassignment to a position that requires a security clearance; or (2) accommodations to remain in a position that requires a security clearance.

18

*Zadzielski v. Dep't of Navy*, 464 F. App'x 902, 904 (Fed. Cir. 2012) (unpublished) ("[Plaintiff], however, raises a claim that is within the Board's authority to consider: that the Navy should have assigned him to duties not requiring a security clearance.").

Still, the Department argues that *Egan* prohibits us from reviewing Sanchez's failure-to-accommodate claim for two reasons.

First, the Department argues that Sanchez's claim challenges the Department's HRP-revocation decision and its later decision to remove Sanchez from his HRP job. In the Department's words, "[t]here is no basis for the distinction Sanchez seeks to draw, for *Egan* purposes, between claims challenging the denial or revocation of HRP certification and claims challenging an employee's subsequent removal from a position requiring HRP certification." Appellee Response Br. at 21. The Department further states that "*Egan* bars review of a termination decision insofar as the termination flowed from the denial or revocation of a security clearance or other determination committed to the discretion of the Executive Branch." *Id.*

As Sanchez points out, the problem with the Department's first argument is that it relies on a straw man. This is because (1) Sanchez's failure-to-accommodate claim does not challenge the HRP revocation or his removal from his HRP position, and (2) Sanchez "stipulated to removal of his HRP-certification" (a point that Sanchez made many times and even underlined in his Opening Brief). Appellant Opening Br. at 27. Claim 1 concerns what happened after the revocation and removal and does not call for review of the Department's HRP decisions.

19

So when the Department says that Sanchez's failure-to-accommodate claim challenges its HRP decision and later removal from his HRP job, it ignores Sanchez's concessions. In a failure-to-accommodate claim where an employee has requested reassignment to a non-HRP position, the initial decision to revoke his HRP certification and the later decision to deny him reassignment to a non-HRP job are severable. *Cf. Makky*, 541 F.3d at 212-13 (noting that a security-clearance denial and a suspension without pay are "two discrete events" and holding that the court had jurisdiction to review the later event). Sanchez concedes that the Department should not have reassigned him to his former HRP job or recertified him under the HRP. At the Department's certification-review hearing, Sanchez had his own expert, Dr. King, say that Sanchez should not perform any HRP duties. Because of this and because Sanchez specifically tailored his claim to non-HRP jobs, his failure-to-accommodate claim leaves the Department's HRP decisions unchallenged.

Second, the Department relies on a phrase from our decision in *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005), and argues that to trigger a right to reassignment, Sanchez would have to prove that the Department's "actions discriminate[d] '*solely* by reason of disability.'" Appellee Response Br. at 24 (quoting *Fitzgerald*, 403 F.3d at 1144). So the argument goes: had the Department decertified Sanchez based on both his disability and some other, perhaps security-related reason, Sanchez would have no right to reassignment. And thus, a reviewing court cannot determine whether Sanchez had a right to reassignment without weighing the validity of all the Department's reasons for decertifying Sanchez

20

without violating *Egan*.

The Department misunderstands Sanchez's allegations and takes the *Fitzgerald* quote out of context. To prove a failure-to-accommodate claim, *Fitzgerald* dictates in full that Sanchez must "show that he was 'otherwise qualified' *for the benefits he sought* and that he was denied those 'solely by reason of disability.'" 403 F.3d at 1144 (emphasis added) (quoting *Johnson ex rel. Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992)). Based on Sanchez's allegations, the benefit that Sanchez sought was reassignment to a non-HRP job, not an accommodation to remain in his HRP job or keep his HRP certification.

Had the Department quoted the complete language from *Fitzgerald*, it would know that the "solely by reason of disability" language relates to the second element of a failure-to-accommodate claim, the otherwise-qualified element. *Id.* This is important because Sanchez can show that he was otherwise qualified as long as he "can perform with or without reasonable accommodation an available reassignment job within the company, though unable to perform his . . . existing job." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161 (10th Cir. 1999) (en banc). And because Sanchez concedes that he was unqualified for his existing HRP job, his qualifications for that position are irrelevant to our otherwise-qualified analysis. *See id.* (clarifying that the otherwise-qualified inquiry "is not limited to the employee's existing job").

Based on Sanchez's allegations, then, he doesn't need to prove that he was unqualified for his HRP job "solely by reason of disability," as the Department asserts. Appellee Response Br. at 24 (quoting *Fitzgerald*, 403 F.3d at 1144). Instead,

21

he can show that he was otherwise qualified for a non-HRP position and that the Department failed to reassign him to one of these positions "solely by reason of disability." *Fitzgerald*, 403 F.3d at 1144 (requiring an employee to show he was otherwise qualified "*for the benefits he sought*" (emphasis added) (quoting *Johnson ex rel. Johnson*, 971 F.2d at 1492)).

If we accepted the Department's argument that, to have a right to reassignment, Sanchez must first prove that he was unqualified for his HRP job solely because of his disability, we would put Sanchez in a worse position than outside job applicants seeking non-HRP jobs who had never been HRP-certified in the first place. Unlike outside job applicants, Sanchez would need to prove that he was qualified for both: (1) the non-HRP jobs he sought; and (2) the HRP job he formerly had but lost solely because of his disability. Nowhere does the Rehabilitation Act impose this double burden. And we see no reason for creating a disparity between outside job applicants and reassignment seekers when the Rehabilitation Act prohibits discrimination against disabled individuals regardless of "[w]hether the disabled person is an existing employee seeking reassignment or an outside job applicant." *Smith*, 180 F.3d at 1164.

Because Sanchez requested reassignment to non-HRP jobs and offered to take "any position, even janitorial," his failure-to-accommodate claim doesn't challenge the Department's HRP-revocation decision. Appellant App. vol. I at 25. Thus, *Egan* doesn't bar our review of his claim and the district court erred in concluding that it

lacked jurisdiction to review Claim 1.[5]

## 2.    Procedural Due-Process & *Egan*

For Claim 4, Sanchez alleges that the Department violated his procedural-due-process rights by appointing Vukosovich, who Sanchez contends was a biased decision-maker, to make the final decision regarding his termination. "To assess whether an individual was denied procedural due process, '[we] must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process.'" *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) (quoting *Hatfield v. Bd. of Cty. Comm'rs*, 52 F.3d 858, 862 (10th Cir. 1995)).

---

[5] Sanchez also argues that *Egan* allowed the district court to review his failure-to-accommodate claim because courts can review "whether an agency violated its own statutory or regulatory procedures." Appellant Opening Br. at 28. He then explains how the Department violated the HRP by failing to reassign him to a non-HRP job. He points to various HRP regulations, including 10 C.F.R. §§ 712.19, 712.36(g), and 712.36(h). He argues that these regulations show that the Department revoked his HRP certification for safety, rather than security, reasons and that the HRP-designated psychologists recommended that the Department accommodate his disability. He also filed his Motion to Supplement to show that the Department violated these same HRP regulations.

In light of our determination that the district court had jurisdiction to consider Sanchez's failure-to-accommodate claim, we need not address these other arguments for reversal on this issue. *Cf. Predator Int'l., Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1194 (10th Cir. 2015) (deciding not to consider other arguments for reversal in light of the court's decision to reverse on other grounds). For that reason, we also decline to address the facts that Sanchez cites to support those arguments.

In the *Egan* context, it's well-established that people do not possess a protected liberty or property interest in security clearances. *E.g.*, *Hill*, 844 F.2d at 1411; *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990). Thus, under *Egan*, a procedural-due-process claim typically fails at step one. An employee cannot show a liberty or constitutional interest to a security clearance because it "is merely temporary permission by the Executive for access to national secrets," and so "[w]hatever expectation an individual might have in a clearance is unilateral at best, and thus cannot be the basis for a constitutional right." *Hill*, 844 F.2d at 1411. "The same is true of a suspension" that follows a security-clearance revocation. *Id.* at 1412. Thus, under *Egan*, "security clearance decisions are not reviewable for 'minimum due process protection.'" *Robinson v. Dep't of Homeland Sec.*, 498 F.3d 1361, 1364 (Fed. Cir. 2007); *see Duane*, 275 F.3d at 994 ("It is likewise plain that there is no 'right' to a security clearance, so that full-scale due process standards do not apply . . . .").

Still, Sanchez asserts that he "has a right to substantive due process in the termination of his federal employment." Appellant Opening Br. at 50. Assuming such due-process rights exist, "they did not include the right to contest the merits of the decision to suspend his [HRP] clearance." *Gargiulo v. Dep't of Homeland Sec.*, 727 F.3d 1181, 1185 (Fed. Cir. 2013). And allegations of bias inherently attack a decision-maker's merits and motives. *See Dorfmont*, 913 F.2d at 1401(stating that although the plaintiff fashioned her claims as due-process challenges based on an examiner's bias, they were still "attacks on the merits of the decision to lift her

24

security clearance"). Therefore, because Sanchez alleges bias to attack the merits of the underlying HRP-revocation decision and "his job los[s] as a result," *Egan* applies and the district court lacked authority to review Claim 4. *Hill*, 844 F.2d at 1411.

## II.     Has Sanchez Stated a Failure-to-Accommodate Claim?

Though we hold that *Egan* doesn't bar us from reviewing Sanchez's failure-to-accommodate claim, the Department asserts in the alternative that we should affirm the district court's dismissal of the failure-to-accommodate claim on the claim's merits, arguing that Sanchez has failed to state a claim for relief. We disagree.

### A.     Rule 12(c) and 12(b)(6) Standards

We review whether Sanchez stated a claim under Rule 12(c) de novo, applying the same standards that apply to Rule 12(b)(6) dismissals. *BV Jordanelle, LLC v. Old Republic Nat'l Title Ins. Co.*, 830 F.3d 1195, 1200 (10th Cir. 2016).

Thus, to survive judgment on the pleadings, Sanchez must allege "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To determine whether the claim to relief is "plausible on its face," we examine the elements of the particular claim and review whether the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to [Sanchez]." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). Though we

25

construe factual allegations as true, we refuse to accept mere labels and legal

conclusions as true. *Id.*

### B.    Rehabilitation Act

As we said above, to state a failure-to-accommodate claim under the

Rehabilitation Act, Sanchez must allege that: (1) he is disabled; (2) he is "otherwise

qualified"; and (3) he requested a plausibly reasonable accommodation. *Sanchez*, 695

F.3d at 1177 (quoting 29 U.S.C. § 794(a)).

The Department doesn't contest whether Sanchez sufficiently pleaded the first

and third elements, and for good reason. For element one, as long as Sanchez has a

"physical or mental impairment that substantially limits one or more major life

activities" he is disabled under the Rehabilitation Act. 42 U.S.C. § 12102(1)(A); *see*

29 U.S.C. § 705(9)(B) (referring to the ADA definition for certain Rehabilitation Act

purposes). And the ability to read is one of the statutorily defined major life

activities. 42 U.S.C. § 12102(2)(A). As for the third element, Sanchez requested

reassignment many times, even using the HRP-certification hearing as an opportunity

to make his case for reassignment.

The Department challenges the claim based on element two. So we must

decide whether Sanchez's complaint sufficiently alleged that he was otherwise

qualified. *See Poindexter v. Atchison, Topeka and Sante Fe Ry. Co.*, 168 F.3d 1228,

1230 (10th Cir. 1999) (reversing the district court's judgment based on one element

of a disability claim without addressing the remaining two elements).

26

The "otherwise qualified" element involves a two-part analysis. *Woodman*, 132 F.3d at 1340. First, we ask whether a reasonable accommodation would have enabled Sanchez to perform his original job. *Id.* Because Sanchez concedes that he was unable to perform his original job as an Emergency Operations Specialist, we move to the second step. At step two, we ask whether the Department could have "transferred [Sanchez] to other work which could be done with or without accommodation." *Id.* (quoting *Gonzagowski v. Widnall*, 115 F.3d 744, 747 (10th Cir. 1997)). At this stage, "employers are only required to reassign employees to existing vacant positions." *Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013). Vacant positions are those to which "a similarly situated, non-disabled employee" could apply. *Id.*

To survive judgment on the pleadings, then, Sanchez must identify "a specific vacant position to which he could have reasonably been reassigned." *Id.* In his complaint, Sanchez identified 29 vacant positions, none of which required HRP certification, and alleged that he could perform "the essential functions of one or more" of these positions. Appellant App. vol. 1 at 25-26, 30. Sanchez also detailed the job tasks that he had performed from 1983 to 2002 as a Property Book Officer, which included the administrative duties of "managing books, supply accountability, and acquisition of classified Patriot system repair parts." *Id.* at 18.

Taking these factual allegations as true and considering that the vacant positions identified by Sanchez had administrative titles that would include job duties similar to his work as a Property Book Officer, such as "Administrative Assistant" or

27

"Administrative Support Assistant," *id.* at 25-26, Sanchez sufficiently pleaded that he was otherwise qualified for such vacancies. Accordingly, the district court erred in dismissing Sanchez's failure-to-accommodate claim.

## CONCLUSION

For the reasons above, we REVERSE in part and AFFIRM in part the district court's Rule 12(c) dismissal. We vacate the district court's judgment on the pleadings as to Claim 1—Sanchez's failure-to-accommodate claim—and remand the matter for further proceedings consistent with this opinion. But we affirm the district court's dismissal of Claims 2-4—the retaliation, disparate treatment, and procedural-due-process claims—as well as the district court's order denying Sanchez's Motion to Supplement.